**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ANTHONY WICK, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-11-0286 |
| | § | |
| MICHAEL ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pretrial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B).  (Docket Entry #2).  Cross-motions for summary judgment have been filed by Plaintiff Anthony Wick ("Plaintiff," "Wick"), and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA").  (Plaintiff's Cross-Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #6; Defendant's Cross-Motion for Summary Judgment and Memorandum in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #5).  Each party has filed a response to the competing motion.  (Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #8; Defendant's Response to Plaintiff's Cross-Motion for Summary Judgment ["Defendant's Response"], Docket Entry #7).  After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Defendant's motion be GRANTED, and that Plaintiff's motion be DENIED.

**Background**

On October 15, 2007, Anthony Wick filed an application for Disability Insurance Benefits ("DIB"), under Title II of the of the Social Security Act ("the Act"), and for Supplemental Security Income ("SSI") benefits, under Title XVI of the Act. (Transcript ["Tr."] at 98-108).   In his application, Plaintiff claimed that he had been unable to work since June 15, 2007, due to "[d]iabetes, asthma, arthritis, back problems, [and] sleep apnea." (Tr. at 124).  On appeal, he also claimed to suffer from hypertension, shingles, incontinence, impotence, and depression.  (Tr. at 145, 148).  Wick later added that he suffers from itching skin and hemorrhoids.  (*See* Tr. at 40-44).  On November 14, 2007, the SSA denied his application for benefits, finding that he was not disabled under the Act.  (Tr. at 63-66).  Plaintiff petitioned for a reconsideration of that decision, but his claim was again denied.  (Tr. at 72-74).

On March 21, 2008, Plaintiff requested a hearing before an administrative law judge.  (Tr. at 76-80).  The hearing took place on August 25, 2008, before ALJ Gerald Meyer.  (Tr. at 27-60).  Plaintiff appeared with his attorney, Michael Hengst ("Hengst"), and he testified in his own behalf.  (*Id.*).  The ALJ also heard testimony from Cecile Johnson ("Johnson"), a vocational expert.  (*Id.*).  Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Wick was capable of performing substantial gainful activity or was, in fact, disabled:

> 1.     An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).
>
> 2.     An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

2

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  It is well-settled that, under this analysis, the claimant has the burden to prove any disability that is relevant to the first four steps.  *See Audler*, 501 F.3d at 448; *Perez*, 415 F.3d at 461; *Wren*, 925 F.2d at 125.  If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy.  *See Audler*, 501 F.3d at 448; *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "'A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.'"  *Randall v. Astrue*, 570 F.3d 651, 652 (5th Cir. 2009) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)); *accord Audler*, 501 F.3d at 448.

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability.  *See Perez*, 415 F.3d at 461; *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  A person is disabled only if he is "'unable to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" *Randall*, 570 F.3d at 653 (quoting 42 U.S.C. § 1382c(a)(3)(A)); *accord Perez*, 415 F.3d at 461.  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Id.*  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Randall*, 570 F.3d at 657 (citing 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that he "'is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work'" which exists in the national economy.   *Id.* (quoting 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence, the ALJ determined that Wick suffers from "[a] history of asthma, non-insulin dependent diabetes mellitus type II,[1] hypertension, insomnia, hemorrhoids, umbilical hernia, obesity and osteoarthritis[2] of the knees accompanied by low back pain," and that those impairments are "severe."  (Tr. at 19).  He concluded, however, that none of Wick's impairments, or any combination of impairments, meets, or equals in severity, the medical criteria for any disabling impairment listed in the applicable SSA regulations.  (Tr. at 22).  Next, the ALJ found that Wick generally has the residual functional

---

[1] "Diabetes mellitus" is "a complex disorder of carbohydrate, fat, and protein metabolism that is primarily a result of a deficiency or complete lack of insulin secretion by the beta cells of the pancreas or of defects of the insulin receptors." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 477 (5th ed. 1998).

[2] "Osteoarthritis" is a disease "characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and change in the synovial membrane.  It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1286 (29th ed. 2000).

capacity ("RFC") "to perform the full range of sedentary work." (*Id.*). The ALJ found, however, that Wick required additional restrictions. The ALJ stated that Wick could sit for no more than six hours in an eight-hour workday, and could stand or walk for no more than two hours in an eight-hour workday. (*Id.*). He also found that Wick could only occasionally lift or carry items that weigh more than ten pounds. (*Id.*). He further determined that Wick must avoid "concentrated exposure to fumes, dusts, gases as well as other irritants and dangerous machinery." (*Id.*). Significantly, the ALJ also found that Wick is capable of returning to his past relevant work as a "cartographer."[3] (*Id.* at 26). With that finding, the ALJ concluded that Wick "has not been under a disability, as defined in the Social Security Act, from June 15, 2007, through the date of this decision," and he denied the application for benefits. (*Id.*).

Plaintiff then requested a review of the ALJ's decision. (Tr. at 10, 12). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; [or] (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On December 7, 2010, the Appeals Council denied Wick's request, finding that no applicable reason for review existed. (Tr. at 1-4). With this ruling, the ALJ's decision became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

On January 21, 2011, Wick filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the Commissioner's decision. (Docket Entry #1).

---

[3] In his application for benefits, Wick reported that he worked as a cartographer for the Natural Resources Conservation Service in Rosenberg, Texas, from February 1999 through September 2007. (Tr. at 181). He described his duties as "working with air photos, [and] tracing and completing soil maps for Texas and surrounding states." (*Id.*). In the record, Wick's job is variably referred to as "cartographer," "cartography aide,"and "cartography technician."

Subsequently, the parties filed cross-motions for summary judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, the court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.*  "'Substantial evidence is more than a scintilla, less than a preponderance, and is such that a reasonable mind might accept it as adequate to support a conclusion.'"  *Randall*, 570 F.3d at 662 (*quoting Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992)); *accord Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Randall*, 570 F.3d at 662; *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000).  In making this determination, the court must weigh the following four factors:  the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his pain; and Plaintiff's educational background, work history, and present age.  *See Wren*, 925 F.2d at 126.  If there are no credible evidentiary choices or medical findings that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.

2000)).

**Discussion**

Before this court, Plaintiff contends that the ALJ committed three errors.  (Plaintiff's Motion at 4-8).  He claims, first, that the ALJ erred because he "found that Wick could only perform unskilled occupations and cartography aide is a 'highly skilled' occupation."  (*Id*. at 4-5).  Next, Plaintiff complains that the ALJ erred because he failed to take into account the fact that Wick was "close to retirement age."  (*Id*. at 5-6).  Finally, Plaintiff claims that the ALJ's decision was "based on the erroneous premise that [Wick] was capable of competitive employment."  (*Id*. at 6-8).  Defendant insists, however, that the ALJ properly considered all of the available and relevant evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Defendant's Response at 1-6).

### *Medical Facts, Opinions, and Diagnoses*

The majority of the medical records documents Wick's treatment at the Michael E. DeBakey Veterans Affairs Medical Center ("VAMC") in Houston, Texas, from July 1999, through May 2008.  (Tr. at 201-324, 327-61).  These records show that Wick regularly complained of knee pain, and that he was routinely treated for osteoarthritis of both knees, lower back pain, hyperglycemia,[4] or hypoglycemia,[5] all of which were considered to be associated with his diabetes mellitus type II.  (*See id*.).   The records also show that Wick suffered from insomnia and suspected sleep apnea.[6]

---

[4] The term "hyperglycemia" refers to a "greater than normal amount of glucose in the blood."  MOSBY'S at 790.

[5] The word "hypoglycemia" means "a less than normal amount of glucose in the blood."  *Id*. at 799.

[6] "Sleep apnea" is "a sleep disorder characterized by periods of an absence of attempts to breathe."  *Id*. at 1503.

However, Wick was prescribed a c-pap machine,[7] but he refused to use it.  In addition, the medical records show that Plaintiff was treated for a variety of other disorders, such as hypertension, high cholesterol, erectile dysfunction, asthma, obesity, hemorrhoids, restless leg syndrome, and dermatophytosis.[8]  (Tr. at 307).

VAMC medical records from April 2007, show that Wick had a routine diabetes check-up.  (Tr. at 306).  At that time, he was informed that he had reached the maximum dosages of diabetes medication, and that "the next step," if necessary, was "to start insulin" treatment.  (*Id*.).  Wick refused to take insulin.  (*Id*.).  Plaintiff was also counseled about the benefits of losing weight and regular exercise.  (*Id*.).  The records show that, in June 2007, Wick had a benign cyst removed from his back and he was treated for a skin rash at the same time.  (Tr. at 279-82).  In July 2007, Wick had another routine appointment.  At that time, Wick claimed to be suffering from frequent urination and episodes of hyperglycemia.  Wick also complained of symptoms related to an umbilical hernia, including lower abdomen pain and tenderness.  (Tr. at 245-46).  The doctor noted that radiological test results revealed the presence of a very small hernia.  (*See id*).  The doctor recommended that Plaintiff undergo hernia repair surgery because of the discomfort it was causing.  (*Id*.).  Wick declined, however, stating that he was not interested because he would have to lose a lot of weight before undergoing the procedure.  (*Id*.).

In August 2007, Wick was seen at the VAMC by Dr. Michael Heggeness ("Dr. Heggeness"), an orthopedic surgeon, due to his complaints of knee pain.  (Tr. at 264).  Dr. Heggeness recommended that Wick proceed with steroid injections and physical therapy.  (*Id*.).  Wick got the

---

[7] "C-pap" is an "abbreviation for continuous positive airway pressure."  *Id.* at 411.

[8] The term "dermatophytosis" refers to "a superficial fungus infection of the skin."  *Id.* at 470.

injections, and reported that his knee pain had decreased.  (Tr. at 213-14).  At his diabetes appointment in August 2007, Wick was reported to be obese, and was informed that his obesity was contributing to his difficulty with blood sugar levels.  It was again recommended that Wick comply with a diet and exercise program.

In September 2007, Wick returned to the VAMC with "a myriad of somatic complaints." (*See* Tr. at 246-51).  Those complaints included right shoulder pain, and peripheral neuropathy of the feet.  (*Id.*).  Wick also complained of hernia pain, but again rejected surgery.  (*Id.*).   On September 5, 2007, Wick had a physical examination, which revealed good range of motion in his right shoulder and arm, no pain to palpation at the elbow, and good grip strength bilaterally.  (Tr. at 246, 251).  Plaintiff was again counseled ro remain compliant with a diet and exercise routine. (*Id.*).  At that visit, Plaintiff also reported that he was not taking his diabetes medications consistently as prescribed.  (Tr. at 261).  At an October 29, 2007, visit, Plaintiff was examined by Dr. Nicholas Masozera ("Dr. Masozera"), an internist.  (Tr. at 226).  Wick's "main complaint" to Dr. Masozera was "low back pain."  (*Id.*).  Wick told Dr. Masozera that the pain in his right shoulder "ha[d] improved in the last month."  (*Id.*).  He also reported to the doctor that his "pain level was acceptable to [him]."  (Tr. at 230).  In response to Dr. Masozera's inquiry into his mental health, Wick stated that he had experienced no depression symptoms "at all" in the past two weeks.  (*Id.*). Beginning in November 2007, Wick attended physical therapy once each week.  At his first appointment, Wick informed the physical therapist that, since he had been given the steroid injection in August 2007, "his knee ha[d]n't been bothering him," aside from "some weakness and pain" under extraordinary circumstances.  (Tr. at 217).  At an appointment on November 19, 2007, Wick told his physical therapist that "his knee fe[lt] better," and that he had "walked from the parking lot

till [sic] here today without any problem." (Tr. at 215). Medical records from December 2007, show that Wick's range of motion had returned to functional limits; indeed, he reported that he felt stronger, that he could walk for longer distances, and that he was no longer suffering from knee pain. (Tr. at 210-11). The physical therapist discharged Wick from physical therapy on December 7, 2007, and noted that Plaintiff "reports that he feels stronger, can walk for longer distances & has no pain in the knee at present." (Tr. at 211). The physical therapist commented that he had recommended that Wick use an assistive ambulatory device when walking distances to reduce the chances of a flare-up of pain, but reported that Plaintiff had rejected the idea. (Tr. at 217). The VAMC records show that, by January 2008, Wick was again complaining of knee pain. (Tr. at 201-14). He also complained of "dizziness," "cold sweats," "blurred vision in AM upon waking," and tiredness. (Tr. at 207). Wick was examined, and the doctor made a note that he was concerned about Plaintiff's glucose levels, which were at a level associated with hypoglycemia. (Tr. at 201-14). For the knee pain, the doctor prescribed another round of steroid injections. (*See id.*). Wick was reported to have "tolerated [the] injection[s] well" and he showed improvement. (Tr. at 205).

On April 21, 2008, Wick went to the VAMC emergency room and complained of "irritation" in his left eye that had been troubling him for one week. (Tr. at 339). He was treated by Dr. Richa Gupta ("Dr. Gupta"), an internist, who diagnosed "red eye," or "viral conjunctivitis."[9] (*Id.*). Dr. Gupta also thought it possible that a stye was developing. (*Id.*). Dr. Gupta recommended the use of warm compresses and artificial tears to relieve the discomfort and to keep the area clean. (*Id.*). On April 22, 2008, Plaintiff sought additional help from Dr. Sheila Hartis ("Dr. Hartis"), an

---

[9] "Conjunctivitis" is an "inflammation of the conjunctiva [the membrane in the lining of the eye], caused by bacterial or viral infection, allergy, or environmental factors." *Id.* at 387.

optometrist at the VAMC.  (Tr. at 331-38).  Wick reportedly told Dr. Hartis that his "left eye ha[d] been red and crusty for about 1 week and ha[d] been painful for the ... past 2 days."  (Tr. at 335). Dr. Hartis examined Wick, and diagnosed him as suffering from conjunctivitis.  (Tr. at 338).  She also noted that Wick suffered from diabetes mellitus.  (*Id*.).  To treat the conjunctivitis, Dr. Hartis prescribed medication to clear the redness and inflammation from Wick's eyes, and recommended cold compresses and artificial tears to clean and ease discomfort.  (*Id*.).  At this appointment, Dr. Hartis also performed a vision examination.  (Tr. at 336).  She found that, without correction, Wick had 20/40 vision in his right eye, and 20/60 vision in his left eye.  (Tr. at 336).  Plaintiff saw Dr. Hartis again on May 12, 2008, when he returned for a follow-up examination.  (Tr. at 331-34).  At that appointment, Wick told Dr. Hartis that his eye was no longer painful, although she noted that it was "still a little red."  (*Id*.).  Dr. Hartis examined Plaintiff's vision again.  (Tr. at 332-33).  Dr. Hartis found that, uncorrected, Wick's vision was becoming farsighted.  (*Id*.).  However, she found that, with correction, Wick's right eye was at 20/25, his left eye was 20/20, and his peripheral vision was "intact."  (*Id*.).  Dr. Hartis diagnosed Plaintiff as suffering from presbyopia[10] and "recent conjunctivitis, ... mostly resolved."  (*Id*.).  She reported no evidence of diabetic retinopathy.[11]  (*Id*.). Dr. Hartis recommended that Plaintiff keep his eyes clean, using artificial tears as necessary, and that he return in two years for a routine examination.  (Tr. at 334).  In her report, Dr. Hartis also noted that Wick was not performing his daily glucose tests, and that he had apparently stopped taking some of his diabetes medication.  (Tr. at 331-32).

---

[10] The term "presbyopia" refers to "a hyperopic shift to farsightedness resulting from a loss of elasticity of the lens of the eye."  *Id*. at 1317.  This condition "commonly develops with advancing age."  *Id*.

[11] "Diabetic retinopathy" is "a disorder of retinal blood vessels," and is common "in patients with long-standing poorly controlled diabetes mellitus."  *Id*. at 479.

A May 2008 progress note from the VAMC showed that Wick was seeing a nutritionist, and that he had lost 15 pounds.  (Tr. at 229).  It also showed that many of Wick's ailments, including diabetes, insomnia, hypertension, asthma, and hemorrhoids, were being controlled by medication. (*Id*.).  The note further stated that Wick reported suffering from some symptoms of depression, but that he had stopped taking prescribed anti-depressant medication and declared, "I guess my normal state is to be depressed."  (*Id*.).  At the conclusion of the progress note, Wick reported that he was otherwise "doing well," and that he had "no complaints."  (*Id*.).

Another set of medical records, dating from June and July 2006, document Plaintiff's treatment by Dr. John Ott ("Dr. Ott"), an internist.  (Tr. at 191-92).  The first of these records show that, on June 23, 2006, Wick told Dr. Ott that his back itched and that he was "very uncomfortable." (Tr. at 192).  Dr. Ott examined him, and found a rash on Plaintiff's back.  (*Id*.).  Dr. Ott diagnosed Wick as suffering from dermatitis folliculitis,[12] and prescribed medication.  (*Id*.).  Wick saw Dr. Ott again on July 12, 2006.  (Tr. at 191).  At that appointment, Wick complained of back pain and of another rash.  (*Id*.).  Dr. Ott prescribed medication.  (*Id*.).  In his report, Dr. Ott also wrote that Wick was not always compliant with his diabetes treatment regimen.  (*Id*.).

The next medical record shows that, on November 12, 2007, Dr. Terry Collier ("Dr. Collier"), a specialist in endocrinology, diabetes, and metabolism, assessed Wick's physical residual functional capacity ("RFC") on behalf of the state.  (Tr. at 193-200).  Dr. Collier gave Wick a primary diagnosis of "diabetes," and a secondary diagnosis of "obesity."  (Tr. at 193).  He noted that Wick claimed to be suffering from osteoarthritis.  (*Id*.).  Based on the medical records, Dr. Collier found that Wick could lift or carry objects weighing ten pounds occasionally, and could lift or carry

---

[12] "Dermatitis folliculitis" is "an inflammatory condition" of the skin surrounding hair follicles.  *Id*. at 468, 649.

objects that weigh less than ten pounds frequently.  (Tr. at 194).  He stated that Wick's ability to push or pull was unlimited except for those weight limitations.  (*Id.*).  Dr. Collier also found that, in an eight-hour workday, Wick could stand or walk for at least two hours and sit for a total of six hours.  (*Id.*).  Next, Dr. Collier found that Wick must have a job that did not require "balancing," and that required climbing, stooping, kneeling, crouching, or crawling only occasionally.  (Tr. at 195).  Dr. Collier then determined that Wick had no manipulative, visual, communicative, or environmental limitations.  (Tr. at 196-97).  The doctor concluded that "[t]he alleged limitations are partially supported by the medical and other evidence of record[s]," but that "[t]he alleged severity and limiting effects from the impairment are not wholly supported."  (Tr. at 198).

The final medical record shows that Dr. Collier's assessment was reviewed and affirmed on January 30, 2008, by Dr. Laurence Ligon ("Dr. Ligon"), a family practitioner, also working on the state's behalf.  (Tr. at 325).  In reviewing Dr. Collier's findings, Dr. Ligon considered additional medical records.  (*Id.*).  Dr. Ligon made particular note of one record, from November 2007, which indicated that an examination of Plaintiff's left knee showed no instability, no effusion, and a full range of motion.  (*Id.*; *see* Tr. at 215-16).  Dr. Ligon also referenced treatment notes from December 2007, which  showed that Plaintiff's range of motion in his left knee was within functional limits.  (Tr. at 325).  Dr. Ligon noted that, according to the December record, Wick reported that he felt stronger, that he could walk for longer distances, and that he had no knee pain.  (*Id.*; *see* Tr. at 210-11).

### *Educational Background, Work History, and Present Age*

At the time of the hearing, Wick was 61 years old.  (Tr. at 30).  Plaintiff is a college graduate, having earned a bachelor's degree in sociology.  (*Id.*).  He has past relevant job experience as a

"courier" and as a "cartographer."  (Tr. at 31).

### Subjective Complaints

In his application for benefits, Wick claimed that he had been disabled, and unable to work, since June 15, 2007, because of diabetes, asthma, arthritis in his knees, back problems, sleep apnea, hypertension, shingles, incontinence, and depression. (Tr. at 124, 145-48).  He reported that he weighed approximately 330 pounds.  (Tr. at 145).  Wick also stated that he took medication to control his physical symptoms.  (Tr. at 168).  He reported taking no medications for depression.  (Tr. at 161).  With his application, Wick completed a Daily Activity Questionnaire, on which he made the following remarks about his physical condition:

> I have arthritis in both knees and chronic back pain which make[s] it difficult to walk, stand, do housework or everyday chores.  I am tired all the time.
>
> *   *   *
>
> My hand goes numb playing my guitar.  Even sitting, my legs feel heavy.

(Tr. at 138).  He wrote that he took medication and "r[ode] an exercise bike" to relieve his discomfort.  (Tr. at 138-39).  He added, "I'm always tired so I nap a lot; like to read, but it is tiring on my eyes."  (Tr. at 139).  In conclusion, Wick made the following comment:

> I am tired of being tired.  Am depressed, worried and a little scared.  Am disgusted with my weight and want to get better.

(Tr. at 140).

Wick also completed a Daily Activity Questionnaire on the issue of his mental health.  (Tr. at 156).  On that questionnaire, Wick stated that he "was treated for depression at the VA hospital." (Tr. at 156).  He reported that he did not "have mental or emotional problems that limit what [he was] able to do."  (*Id.*).  But he did say that his mental status was such that he "[did not] like parties as much as [he] used to"; that it caused him stress, particularly about his "health [and] financial

14

situation"; and that it lead him to "probably sleep more."  (Tr. at 159).  Wick also surmised that his poor emotional health was the cause of his itching skin and "chronic hives."  (Tr. at 160).  On the questionnaire, Wick reported that he spent most days "napping, watch[ing] TV, [and] reading."  (Tr. at 157).  He stated that he lived alone, had no difficulty "caring for [his] personal needs," used a microwave, went grocery shopping without assistance, took clothes to the cleaners, handled his own money and checking account, drove a car, and used a riding lawn mower.  (Tr. at 157-58).  Wick also reported that he did light household chores, but would "[s]ometimes hire a maid."  (Tr. at 158).  Wick stated that he attended church, and went out to see movies and to parties, but only a few times a year.  (Tr. at 159).

At the hearing, Wick testified that he suffers from diabetes, asthma, arthritis in the knees, chronic neck and back pain, acid reflux, sleep apnea, high blood pressure, high cholesterol, and vision problems.  (Tr. at 31, 36-47).  He reported that he weighed 320 pounds.  (*Id.*).  Wick testified that he had a small hernia, but that his doctor has no immediate plans to operate, because his weight might result in complications.   (Tr. at 37).   Wick further testified that he "probably ha[s] depression."  (Tr. at 36).  Wick testified, as well, that he had a plate in his left knee from an arthroscopic procedure performed in the mid 1990s.  (Tr. at 37).  He stated that this surgery did not result in the intended pain relief, as his left knee remains troublesome.  (Tr. at 38).  Wick testified that he has suffered from lower back pain since he was a child, but that the cause is unknown.  (Tr. at 42).  Wick also testified that he has some difficulty turning his neck because of arthritis, a "little hump" on his upper back, and a suspected prior neck injury.  (Tr. at 40-41).  He told the ALJ that when he lifts his head, as he often did when he worked as a cartographer, his neck became stiff or even painful.  (Tr. at 41).  Wick further testified that he has difficulty with frequent urination, itching

15

and numbness in his hands and feet, and hemorrhoids.  (Tr. at 40-44).  Wick testified that he takes

Tylenol for pain relief, and medication to control his diabetes, blood pressure, and cholesterol levels.

(*Id*.).  He also testified that he was prescribed medication for depression, and that his doctor

recommended a c-pap machine to treat his sleep apnea, but that he chooses not to use either

treatment.  (Tr. at 44).  Wick testified that he ultimately stopped working because of lower back

pain, as well as the following:

> I was having troubles.  I was sick a lot.  I had trouble staying awake during the day.
> I couldn't sleep at night.  And -- plus my eyes were -- I couldn't do the work very
> well.  But mainly it's just I had trouble.  I don't know if it was the pills or -- I was
> taking a lot of medication, and mainly I was just tired all the time, couldn't keep my
> eyes open.

(Tr. at 30).

Wick testified that he lives in a house by himself.  (Tr. at 30-31).  In an average day, he

wakes up between 11:00 a.m. and noon, and spends most of the day listening to the radio, watching

television, or reading.  (Tr. at 45).  He also stated that, within an hour of taking his diabetes

medication, he "ha[s] trouble keeping [his] eyes open," and his legs "get real heavy," and he has to

lie down. (Tr. at 45, 50).  Wick testified that he feels better after a short nap, but that a nap tends to

disrupt his ability to sleep well at night.  (Tr. at 45-46).  Wick testified that, because of pain, he tries

to make his food in the microwave and limit the number of dishes he has to wash.  (Tr. at 46-47).

He stated that he tries to limit household chores to five-minute intervals.  (*Id*.).  Wick testified that

he uses a riding lawn mower to mow his lawn, and hires someone to help with other yard work.  (Tr.

at 47).  Plaintiff said that he can take care of his personal hygiene, although he has difficulty putting

on socks and shoes because of the bending involved in those tasks.  (Tr. at 47-48).  Wick testified

that he does his own grocery shopping.  (Tr. at 38).  He commented that it helps to lean against the

grocery cart when he can.  (*Id*.).  Wick also testified that he drives a car.  (Tr. at 47-48).

Wick told the ALJ that he can stand straight for approximately 30 to 40 minutes, but that he cannot bend for more than three minutes without pain.  (Tr. at 43).  He testified that he "can sit for hours," but periodically changes chairs to relieve stiffness.  (Tr. at 37, 45).  Wick testified that his left knee begins to hurt when he walks "for long distances," and that he limps after walking two or three blocks.  (Tr. at 38).  He testified that he can walk up a flight of stairs, so long as he can hold on to a railing.  (Tr. at 40).  Wick also testified that he has difficulty bending, squatting, and stooping, and may need help getting back on his feet from certain positions.  (Tr. at 48).  Plaintiff further testified that he is "strong," and can pick up and unload groceries, including heavier items such as bags of ice.  (Tr. at 48-49).  He stated that he could probably unload groceries two to three times a day, so long as he is able to pause to sit down or "catch [his] breath."  (*Id*.).

Finally, Wick testified that he received a college degree in sociology in 1976, and worked for a year or two after that as a government social worker.  (Tr. at 49).  He testified that, since then, he has had jobs as a courier for a medical laboratory, and then as a cartographer for the Department of Agriculture.  (Tr. at 29-36, 49-50).  In his application for disability benefits, Plaintiff reported that he was employed as a cartographer for more than eight years, between 1999 and 2007.  (Tr. at 181).

### *Expert Testimony*

At the hearing, the ALJ also heard from Cecile Johnson, a vocational expert.  (Tr. at 50-59). Johnson described Wick's past work as a cartographer as highly skilled, sedentary work.  (Tr. at 50). She described his past work as a courier as "light, unskilled work."  (*Id*.).  The ALJ then posed the following hypothetical question to Johnson:

> Q      Okay.  Ms. Johnson, would you assume for me a person who could stand or walk about two hours in an eight-hour day with normal breaks, or sit for six, lifting

or carrying ten pounds occasionally.  The following are never [sic], ropes, ladders, or scaffolding, kneeling, crawling, dangerous machinery, no exposure to dust, mist, or gasses.  The following are occasionally, stairs, balancing, stooping, crouching.  Could such an individual do the past work that you've described?

(Tr. at 50-51).  Johnson replied, "Yes, sir.  He would perform the position of the cartographer."  (Tr.

at 51).

Plaintiff's attorney, Michael Hengst, then posed a hypothetical question to Johnson, which

resulted in the following exchange:

Q       Let's just start with the Judge's hypothetical question, and then add the limitation that he would have to, you know, be away from his work station at least once an hour for bathroom breaks.  Would that change your answer in any way?

A       Yes.  It would.  Well, how long would the bathroom break be?  Maybe I should ask that.

Q       You know, typical bathroom break to go, you know, ... no more than five minutes.

A       Okay.  It possibly could -- typically, there's [sic] two breaks, and, you know, one lunch.  So that would be eight bathroom breaks, so it possibly would.

Q       ... If ... in addition to the normally scheduled breaks and lunch breaks, if he needed to take six bathroom breaks, of five minutes or less, during the day, would that change your answer?

A       You know, the higher the skilled job, ... the more acceptable it is to go to the restroom, you know.  And five minutes is not really that long of a time.  If the work is not interrupted for an extended period of time, than [sic] I think it would probably be okay, you know, that he would be able to perform the work.

(Tr. at 51-52).  Johnson stated that six breaks of 10 to 15 minutes each would change her opinion

about Wick's ability to work as a cartographer.  (Tr. at 52).

Hengst then asked Johnson a second hypothetical question, as follows:

Q       Okay.  Let's stick with the Judge's hypothetical question again.  Take the break issue away.  We're not talking about that. ... [I]nstead add that he would need to, you know, he had trouble staying awake and would, you know, fall asleep or be

18

absent from his workplace for about 20 minutes during the day, and taking a nap at work. Would that change your answer in any way?

A      Yeah. He would not be able to maintain any employment.

(Tr. at 52-53).

Hengst then posed a third hypothetical question:

Okay. Now let's keep the same restrictions as the Judge's hypothetical question[.] ... If you add that he has issues with his vision that he's not able to do the fine detail work of the mapping job, so you remove that part of his vision from that occupation. Would he have any transferable skills to other sedentary work?

(Tr. at 53). Johnson responded that she could not answer the question without a doctor's findings

about the true nature of Wick's alleged vision problems. (Tr. at 53-54). Hengst then asked what

transferable skills Wick has, absent the referenced vision problems. (Tr. at 54). Johnson testified

that, considering age, education, and employment history, Wick's transferable skills include "basic

office skills, office type, you know, using a computer, using mathematics, gathering information,

critical thinking, [and] being able to classify materials." (*Id*.). She stated that those skills would

transfer to clerical jobs within the same field of work. (Tr. at 55). She stated that his background

would enable him to "[d]eal[] with the same type of data" that a cartographer does. (*Id*.).

Hengst then posed another hypothetical question:

Q        ... [S]tarting with the hypothetical that the Judge used, and you add just the limitation that due to his neck, restrictions with his neck, he wouldn't be able to do bench type work where he would have to have a constant gaze down. Would that change your answer in any way?

A      Well, another tough one. You have to be able to bend over to be looking down, twisting your neck. So, yeah, it probably would, if you're unable to do that, then -- for most of the day, it would change my answer.

Q      And how would it change your answer?

A      It would be difficult to maintain employment. He would probably take to

19

many breaks.

Q        Okay.  Would it become an issue because of breaks or would he actually have problems actually doing the job, say, or the cartography tech?

A        Would probably have difficulty doing the job.

Q        Okay.  So he couldn't do that job if he couldn't have constant, you know, downward vision.  Couldn't do bench work -- he couldn't do bench level work because of the restrictions in his neck.  Could he do the cartography job?

A        It's so difficult to answer, because ... it's a difficult question.  I think he would have difficulty doing the job, yeah.  If you can't be looking down or looking at [sic] computer, it would be difficult performing the job.

(Tr. at 55-56).  Johnson testified that the hypothetical individual had transferable skills, "because there are jobs where you're not constantly looking down or looking at [sic] computer," but instead, for instance, using the telephone.  (Tr. at 56).

Finally, Johnson testified that there a number of jobs that the hypothetical individual could perform, including "[r]eceptionist positions" and "dispatcher" jobs.  (Tr. at 57).  Johnson also told the ALJ that the individual could work as a "file clerk," a "plain clerk that's sedentary," a data "compiler," a "production clerk," an "accounts receivable or accounts adjustable clerk," and a "scheduler."  (*Id.*).  She stated that all of these jobs are "semi-skilled" and sedentary.  (*Id.*).  Johnson testified that the hypothetical individual is capable of performing these jobs in several industries.  (Tr. at 57-58).  But, Johnson emphasized, cartography skills were transferable and, in fact, would enable the individual to work in the same industry as a cartographer, but at a lower skill level.  (Tr. at 58-59).  She stated that, for instance, the individual would still be able to do some work with maps and scales, that he could do drafting work, and compile information from explorations, surveys, and other topographical studies.  (*Id.*).  Johnson testified that such jobs "do [not] have to be [performed] necessarily by computer," so that difficulty using computers did not preclude work in the

cartography field.  (Tr. at 59).  With that, Johnson concluded her testimony, and the hearing ended. (*See* Tr. at 59-60).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  From his review of the record, he concluded that Wick suffers from "[a] history of asthma, non-insulin dependent diabetes mellitus type II, hypertension, insomnia, hemorrhoids, umbilical hernia, obesity and osteoarthritis of the knees accompanied by low back pain," and that those conditions are "severe." (Tr. at 19).  He concluded, however, that none of Wick's impairments, or any combination of impairments, meets, or equals in severity, the medical criteria for any disabling impairment listed in the applicable SSA regulations.  (Tr. at 22).  The ALJ further found that Wick  had the residual functional capacity to perform his past relevant work as a cartographer.  (Tr. at 26).  The ALJ ultimately concluded that Wick was not disabled, and he denied his application for disability benefits.  (*Id*.).  That denial prompted Plaintiff's request for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id*.  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Boyd*, 239 F.3d at 704.

Plaintiff's first complaint is that the ALJ erred when he "found that Wick could only perform unskilled occupations", yet could still work as a cartography aide, because he also found that cartography "is a 'highly skilled' occupation."  (Plaintiff's Motion at 4-5; Plaintiff's Response at

1-2).  There is no doubt that both the vocational expert and the ALJ found that Wick's work as a cartographer was "highly skilled."  (Tr. at 26, 50).  However, Plaintiff is incorrect in his claim that the ALJ "found that Wick could only perform unskilled occupations."  (*See* Plaintiff's Motion at 4-5; Plaintiff's Response at 1-2; Defendant's Response at 1-3; Tr. at 19-25).  It is true that, in his conclusion, the ALJ wrote that Wick had the residual functional capacity to perform "unskilled, sedentary work."  (Tr. at 26).  However, the one-time use of the word "unskilled," is clearly a typographical error, as the substantive text of the ALJ's decision makes repeated references to Wick's ability to perform "skilled" work, and he limited Plaintiff's RFC only on the level of exertion.  (Tr. at 22).  Further, the ALJ's decision is entirely consistent with the testimony from the vocational expert witness, who discussed, at length, the fact that cartography was a skilled profession, while noting that one could work in the field at a lesser level of "skill."  (*See* Tr. at 58-59).  Moreover, the ALJ's finding that Wick could perform his past relevant work, although it is skilled, is fully supported by the evidence in the record.  (*See* Defendant's Response at 2-3).  There is no indication from the evidence that Plaintiff has mental limitations that would affect the level of skill he is capable of performing.  As Defendant points out, Wick claims that he quit his position as a cartographer solely due to physical problems.  (*Id*. at 2; *see, e.g*., Tr. at 30-47, 138-39, 165).156).  In fact, at the hearing, Plaintiff testified that he did not "have mental or emotional problems that limit[ed] what [he was] able to do."  (Tr. at 156).  Further, in his decision, the ALJ considered the subjective evidence that showed that Wick was not mentally impaired.  This evidence includes Wick's ability to manage his house, his personal needs, and his finances without significant assistance.  (Tr. at 24-25).  Additionally, neither Wick's treating physicians nor the state medical experts recommended any limitations on the mental aspects of Plaintiff's job capacities.  (*See*

Defendant's Response at 3).  In short, there is nothing in the ALJ's decision, or in the record, that

suggests that the ALJ's use of the word "unskilled" in a single sentence was any more than an error.

Absent a finding of prejudice, which is not supported here, that error was harmless, and does not

warrant a remand.  *See Mays v. Bowen*, 837 F.3d 1362, 1364 (5th Cir. 1988); *Hall v. Schweiker*, 660

F.2d 116, 119 (5th Cir. 1981).

Plaintiff's second argument for remand is that the ALJ erred because he failed to take into

account Wick's age, which was "close to retirement age."  (Plaintiff's Motion  at 5).  In support of

this contention, Plaintiff cites a former regulation, which provided, as follows:

> If you are close to retirement age (60-64) and have a severe impairment, we will not
> consider you able to adjust to sedentary or light work unless you have skills which
> are highly marketable.

(*Id.* [quoting 20 C.F.R. § 404.1563(d) (rescinded in 2000)]).  Plaintiff also cites a Fifth Circuit case

interpreting that regulation.  *See McQueen v. Apfel*, 168 F.3d 152, 155-56 (5th Cir. 1999)

(recognizing a circuit split regarding whether the regulation required "a specific finding on high

marketability").  Plaintiff's reliance on these authorities is misplaced, however, as the regulations

no longer contain the phrase "highly marketable."  *See* 20 C.F.R. §§ 404.1563(e), 404.1568(d)(4).

Today, the regulations require the ALJ to consider only whether the claimant has transferable skills,

as follows:

> If you are of advanced age and you have a severe impairment(s) that limits you to no
> more than sedentary work, we will find that you have skills that are transferable to
> skilled or semiskilled sedentary work only if the sedentary work is so similar to your
> previous work that you would need to make very little, if any, vocational adjustment
> in terms of tools, work processes, work settings, or the industry.

20 C.F.R. § 404.1568(d)(4).  In this case, the ALJ relied on the vocational expert's testimony that

Plaintiff had particular skills that would transfer to sedentary work within the same occupation or

field. (Tr. at 22-25, 54). The vocational expert witness' findings constitute sufficient evidence to satisfy the requirements of the current regulations. *See* 20 C.F.R. § 404.1568(d)(4). Clearly, the ALJ committed no error by failing to address the issue of "high marketability." (See Defendant's Response at 3-4).

Plaintiff's final complaint is that the ALJ erred because his decision was "based on the erroneous premise that [Wick] was capable of competitive employment." (Plaintiff's Motion at 6-8). He bases this claim on his belief that "the hypothetical question posed to the vocation expert was not based on significant record evidence because [it] did not include all of Wick's limitations." (*Id.* at 7). The particular limitations Plaintiff refers to are Wick's testimony "that he has problems sleeping at night which in turn causes drowsiness during the day," and that some of his medication makes him sleepy at work. (*Id.*; *see* Tr. at 35-36, 46). However, it is clear in this case that the ALJ's findings on the issue of drowsiness are supported by substantial evidence, and were rendered in compliance with the law. First, in his written decision, the ALJ addressed Wick's complaints about "drowsiness," but found them not to be fully credible. (*See* Tr. at 19-25). In particular, the ALJ noted that Wick had refused to use a c-pap machine to help him get adequate sleep. (Tr. at 24; *see* Tr. at 44). It is well settled that the failure to follow recommended treatment is grounds for a finding that a claimant is not disabled. *See Johnson v. Sullivan*, 894 F.2d 683, 685 n.4 (5th Cir. 1990). In addition, there is ample evidence in the record that Plaintiff's insomnia was controlled by medication. (*See, e.g.*, Tr. at 43, 229, 302). As a rule, conditions that can be controlled by medication are not considered to be "disabling." *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *Johnson*, 864 F.2d at 348. In this case, there is substantial evidence that Wick's drowsiness is not a disabling factor for purposes of social security benefits.

Further, Plaintiff's argument that the case should be remanded due to defective hypothetical questions is without merit. (See Defendant's Response at 5-6). The ALJ properly discredited Wick's claim that drowsiness affected his ability to work because it was not supported by the evidence. *See Masterson*, 309 F.3d at 273-74. An ALJ is required to incorporate into a hypothetical question only those limitations "that are supported by evidence and recognized by the ALJ." *Id.* (citing *Boyd*, 239 F.3d at 707). Because the ALJ did not view Wick's claims about "drowsiness" as credible, it was not necessary for him to include them in his hypothetical question to the vocational expert witness. *See id.* Further, Wick's argument fails, because his attorney did incorporate the alleged sleepiness factor into the hypothetical question he posed to the ALJ. (*See* Tr. at 52-53). A claimant's attorney can use the opportunity to question an expert witness to "correct deficiencies in the ALJ's question." *Boyd*, 239 F.3d at 707. In this case, Wick's attorney corrected the deficiency he perceived. (Tr. at 52-53). Here, then, the ALJ's failure to address Wick's drowsiness in his hypothetical question to the vocational expert witness is not a ground for remanding this case.

Finally, the court agrees with Defendant that Plaintiff has shown no grounds on which to disturb the ALJ's ruling. Consistent with Fifth Circuit case law and the Commissioner's regulations, the ALJ properly determined that Plaintiff was not disabled because he retained the ability to perform his past relevant work as a cartographer. (*See* Tr. at 26). In deciding whether a claimant maintains the residual functional capacity to perform his past relevant work, the ALJ determines whether the claimant can perform the work as he actually performed it in the past or as is ordinarily required by employers throughout the national economy. *See Villa*, 895 F.2d at 1022; *see also* 20 C.F.R. § 404.1560(b)(2). In this case, the ALJ presented a hypothetical question to the vocational

25

expert, asking whether an individual with Plaintiff's age, educational background, work experience, and the residual functional capacity described could perform any of Wick's past relevant work. (Tr. at 26, 50-51). The vocational expert responded that Plaintiff could return to his past relevant work as a cartographer. (Tr. at 12, 50-51). When questioned by Plaintiff's attorney, the expert witness explained that Wick had skills that transfer to sedentary work in the same field. (Tr. at 52-53). The ALJ accepted the sum of the vocational expert's testimony, and concluded that Plaintiff could return to his past relevant work. (Tr. at 26). Plaintiff has not shown that his decision was flawed. Further, even if there were flaws in the ALJ's decision, Plaintiff has not shown that he suffered any prejudice as a result. *See Hall*, 660 F.2d at 119. It has long been established that, even if an ALJ errs, his decision will not be disturbed unless the complaining party was prejudiced by the error. *See id.* In a social security benefits case, an individual establishes prejudice by showing that, absent the violation, a different result might have been reached. *See Ripley*, 67 F.3d at 557. Here, there is simply no evidence that might compel the ALJ, on remand, to find that Wick is, in fact, disabled, as defined by the Act. For that reason, Wick has not demonstrated that he has been prejudiced by the ALJ's actions or omissions. *See id.* As a result, the court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's cross-motion for summary judgment be **GRANTED**, and that Plaintiff's cross-motion for summary judgment be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1). Failure to file written objections within the time period provided will bar an aggrieved

party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 30th day of December, 2011.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**